| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br><br>1437 Bannock Street, Room 256<br>Denver, Colorado 80202 | DATE FILED: March 21, 2017 9:11 PM<br>FILING ID: 66EF45F8E3435<br>CASE NUMBER: 2017CV31062 |
| **Plaintiff:**<br><br>**TIMOTHY JULCH**<br><br>v.<br><br>**Defendant:**<br><br>**ALLSTATE FIRE AND CASUALTY INSURANCE CO.** | ▲ COURT USE ONLY ▲<br><br>_____<br><br>Case No. _____<br><br>Division: _____ |
| Attorneys for Plaintiff:<br><br>   M. Gabriel McFarland (#26167)<br>   Cyd Hunt (#15058)<br>   **EVANS & MCFARLAND, LLC**<br>   910 13th Street, Suite 200<br>   Golden, Colorado  80401<br>   tel (303) 279-8300<br>   fax (303) 277-1620<br>   E-mail: gmcfarland@emlawyers.com<br>        chunt@emlawyers.com | |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff, through counsel, M. Gabriel McFarland and Cyd Hunt of Evans & McFarland, LLC, hereby complain against Defendant as follows:

## PARTIES AND VENUE

1.      Plaintiff Timothy Julch is an individual residing in Denver, Colorado.

2.      Defendant Allstate Fire and Casualty Insurance Co. ("Allstate") is an insurance company selling auto insurance throughout the state of Colorado.  Allstate insured to Mr. Julch on March 21, 2014, when he was seriously injured in an auto accident.  The at-issue Allstate policy provided $50,000 in uninsured/underinsured motorist coverage, at least in theory.

3.      Venue is proper pursuant to C.R.C.P. 98(c).

## GENERAL ALLEGATIONS

### The Accident

4.      On Friday, March 21, 2014, at approximately 1:20 p.m., Plaintiff was the restrained driver of his 2011 Jeep Wrangler.  He was sitting at a red light in the eastbound lane of Ridgegate Parkway, at the intersection of Ridgegate Parkway and I-25 in Lone Tree, Colorado.

5.      The driver of a 2000 Buick Regal (the "At-Fault Driver") failed to recognize that Plaintiff was stopped at the red light and rear-ended Plaintiff's vehicle.  The At-Fault Driver was traveling 15-20 miles per hour at the time of the impact.

6.      Plaintiff, who is 6' 4" and 240 pounds, hit the top of his head on the Jeep's roll bar and his knees smashed into the dash.  The front end of the At-Fault Driver's car suffered some damage.  There was minimal damage to Plaintiff's jeep wrangler, which sits higher than the At-Fault Driver's vehicle.

7.      After the collision, Plaintiff was able to get out of his car.  He felt some stiffness in his lower back and neck, and in his right knee, and he was generally shaken, but he did not receive immediate, emergency medical attention.  Once home, the stiffness in his back and neck became painful, his right knee began to swell and became painful, the top of his head started to hurt, and he developed a headache.

8.      The next morning, Plaintiff presented himself to Rocky Mountain Urgent Care in Aurora.  He was examined by a nurse practitioner, who noted:

- Plaintiff was involved in a car accident the previous day.

- His head hit the roll bar.

- He suffered thoracic spasms and thoracic strain.

- His right knee was swollen and bruised; his patella tendon was tender.

She prescribed Valium, Percocet, and warm compresses.

9.      On Tuesday, March 25, 2014, Plaintiff presented to Doctors Express Urgent Care because he felt worse.  He was examined by Dr. Gary Childers.  Dr. Childers noted that Plaintiff was involved in a motor vehicle accident and complained of headache, back pain, right knee trauma, and neck pain and stiffness.  After taking x-rays and evaluating Plaintiff, Dr. Childers referred Plaintiff to SpineOne for further evaluation.

10.      On that same day, Plaintiff visited SpineOne.  He reiterated his complaints of joint pain, stiffness, and swelling, weakness of muscles/joints, muscle pain, muscle weakness, back pain/spasms, difficulty walking, and soreness on the top of his head.  Plaintiff rated his pain in all areas at a 7/8 out of 10.  Dr. Fredric Sonstein examined Plaintiff.  The initial diagnostic impression was:  (1) post traumatic thoracic and lumbar pain consistent with strain syndromes; and (2) post traumatic right knee pain with visible ecchymosis.  Dr. Sonstein ordered MRIs of

Plaintiff's thoracic spine, lumbar spine, and right knee; prescribed physical therapy two times per week for four to twelve weeks; and instructed Plaintiff to schedule a follow-up visit after the MRIs. He also noted that Plaintiff declined an injection of Toradol.

11.     Dr. Sonstein referred Plaintiff to Park Meadows Imaging for the MRIs of his thoracic spine, lumbar spine, and right knee. MRIs were performed on March 26, 2014. There was no significant abnormality of the thoracic spine. But, with respect to the lumbar area, the radiologist identified a left central and subarticular disc protrusion; an increased T2 signal of the posterior annulus with annular tear; and mild impingement of the left L5 nerve root with subarticular narrowing; left central/subarticular disc protrusion at L4-L5 with an annular tear; and mild bulge at L5-S1. The examination of Plaintiff's right knee revealed a proximal infrapatellar high grade tendinopathy with prepatellar bursitis or contusion and mild joint effusion.

12.     On March 28, 2014, Plaintiff returned as ordered for a follow-up at SpineOne. He continued to complain of "ongoing and persistent thoracic and lumbar pain, 6 to 7 over 10 in intensity, right knee pain 6 to 7 over 10 in intensity as well." The results of the MRI of the lumbar spine showed a protrusion at L4-L5, as well as at the L5-S1 level. The MRI of the right knee showed evidence of tendinopathy, bursitis, and an effusion. Dr. Sonstein recommended physical therapy and referred Plaintiff to Steadman Hawkins for orthopedic evaluation and treatment of his right knee, based on his abnormal MRI.

13.     On April 3, 2014, Plaintiff visited the Steadman Hawkins Clinic Denver for evaluation and treatment on his right knee. His chief complaint was "right knee pain following a motor vehicle accident." Dr. James W. Genuario diagnosed prepatellar bursitis and patellar tendonitis. He recommended anti-inflammatory cream and physical therapy.

14.     On April 24, 2014, Plaintiff saw Dr. Sonstein for a follow-up visit. Dr. Sonstein noted that Plaintiff was doing physical therapy twice per week, unfortunately with little relief for his back pain. His back pain was consistently 5 to 6 out of 10, mainly on his right side and now radiating into the right thigh. He was taking Flexeril at night to sleep and had been unable to return to work. Helping a friend move some light model trains almost incapacitated him. The doctor's diagnostic impression was lumbar disc protrusion at L4-L5 and L5-S1 with a combination of discogenic and facetogenic pain. The doctor recommended continued physical therapy, lumbar injections, and would not allow him to return to work due to his severe and progressive pain.

15.     On April 29, 2014, Plaintiff had four lumbar facet joint injections.

16.     On May 13, 2014, Dr. Azra Khan Salahuddin performed a lumbar epidural steroid injection. Plaintiff kept a pain diary for the twelve days following the surgery. During that period of time, normal, everyday activities such as sitting, driving, twisting, etc., continued to cause him intolerable pain.

17.     On May 27, 2014, Plaintiff saw Dr. Sonstein for a follow-up. Plaintiff reported some relief as a result of the injections, but stated that his right-side midback pain was still quite

bothersome.   Dr. Sonstein prescribed more physical therapy and referred Plaintiff for a chiropractic evaluation.

18.     On June 17, 2014, Plaintiff again saw Dr. Sonstein for a follow-up.  He found lumbar disc protrusions at L4-L5 and L5-S1 with stable lumbar symptomatology.  He released Plaintiff to return to work at that time, but he was instructed to avoid lifting objects weighing over 20 pounds and to take frequent breaks as necessary.

19.     On July 15, 2014, Plaintiff again saw Dr. Sonstein for a follow-up.  After evaluating Plaintiff, Dr. Sonstein determined that Plaintiff had reached maximum medical improvement – per Dr. Sonstein, he sustained a permanent injury to the lumbar spine as indicated by his lumbar MRI showing disc protrusions at L4-L5 and L5-S1.  Dr. Sonstein instructed Plaintiff to avoid lifting objects over 20 pounds, as well as high impact activity.  He was assigned a 7% whole person impairment.

### The Lawsuit Against the At-Fault Driver

20.     After attempts to settle with the At-Fault Driver failed, Plaintiff filed suit against the At-Fault Driver on April 23, 2015.

21.     On January 11, 2016, Plaintiff received written permission from Allstate to settle with the At Fault Driver.

22.     On January 13, 2016, Plaintiff finalized the settlement of the case for the At-Fault Driver's liability policy limits.

23.     The case against the At-Fault Driver was formally dismissed on January 15, 2016.

### Allstate

24.     At the time of his auto accident on March 21, 2014, Mr. Julch 2011 Jeep Wrangler was insured under a policy issued by Allstate, which carrier $50,000 of UM/UIM coverage.

25.     Because Plaintiff's damages resulting from his March 21, 2014 accident far exceeded the At-Fault Driver's liability coverage, as well as Plaintiff's underinsured motorist coverage with Allstate, Plaintiff sent a detailed demand packet to Allstate on January 15, 2015, demanding Allstate pay him the $50,000 UM/UIM limits.

26.     Allstate responded on February 18, 2015, by asking more time, until March 6, 2015, to respond to Plaintiff's demand.  Ultimately, Allstate refused to pay Plaintiff his UM/UIM benefits.

27.     On January 12, 2016, Plaintiff renewed his demand for UM/UIM benefits.  At that time, Plaintiff provided Allstate:

- The deposition transcript of Mr. Julch's September 16, 2015 deposition.

- Dr. Gretchen L. Brunworth's December 1, 2016 report following her November 19, 2015 examination of Mr. Julch.[1]

- My January 4, 2016 letter, highlighting all of the ways Dr. Brunworth's report supports Mr. Julch's claims and his damages.

- Mr. Julch's First Supplemental Rule 26(a)(1) Disclosures.

- Plaintiff's amended Rule 26(a)(2) Disclosures, which include Jeffrey Opp's expert report.

28.    On February 11, 2016, Allstate again refused to pay Mr. Julch his UM/UIM benefits.

29.    On April 8, 2016, due to worsening pain, Mr. Julch again visited Dr. Sonstein. Dr. Sonstein reiterated that Mr. Julch should never lift more than 20 pounds, recommended additional physical therapy and chiropractic adjustments, and recommended a repeat MRI.

30.    Dr. Sonstein's notes from the April 8, 2016 examination were sent to Allstate shortly thereafter.

34.    On September 16, 2016, Allstate sent a letter again refusing to pay Mr. Julch his UM/UIM benefits.  And, despite having Sonstein's medical opinions and the medical opinions of Dr. Brunworth, Allstate requested that Mr. Julch submit to yet another medical examination.

35.    In that same letter, Allstate asked for chiropractic records, the names of any treatment providers in the past five years, and information regarding Mr. Julch's treatment at the VA.  Those requests suggest as late as September 16, 2016, Allstate had not bothered to read the voluminous materials provided to it by Mr. Julch.  Chiropractic records, for example, were included in a December 4, 2014 to the At-Fault Driver's insurer, which was sent to Allstate on January 15, 2015.  Similarly, all of the medical providers from whom Mr. Julch received treatment were listed in a November 11, 2014 letter to the At Fault Driver's insurer, which was also sent to Allstate on January 15, 2015.  Moreover, Mr. Julch never received any treatment at the VA.

36.    Mr. Julch saw Dr. Allison M. Fall, M.D. for the medical examination Allstate requested on December 15, 2016.  She performed virtually no physical examination.

37.    Dr. Fall issued her report on the so-called examination on January 9, 2017.

38.    Comparing Dr. Fall's report to Mr. Julch's medical records (which, notably, include the results of a prior independent medical examination commissioned by the At Fault Driver's insurer), and even just observing the internal contradictions in Dr. Fall's account, it is obvious she examined Mr. Julch and his medical history with the preconceived conclusion (to

---

[1] Ms. Brunworth was retained by the At Fault Driver and his insurance company to evaluate Mr. Julch's injuries.

Allstate's benefit) that Mr. Julch did not sustain any compensable injuries in the March 21, 2014 accident.

39.    That conclusion lacks merit on its face.  Among other things, Mr. Julch proved to experienced counsel for the at-fault driver's liability carrier that his accident-related damages exceeded the $100,000 liability policy limits.  Moreover, Dr. Fall's conclusion makes no sense, given that Mr. Julch has rarely seen a doctor as an adult and had never missed a day of work because of knee or back pain from 1993 until the accident, but could not work for twelve weeks immediately after the accident per doctor's orders.

40.    To cite a few additional specific examples:

- On page 1, Dr. Fall acknowledges that Mr. Julch benefited from facet joint injections, and on page 4 she notes, "On 5/27/14, a facet injection was particularly effective at alleviating his pain and increasing his lumbar mobility."  Nonetheless, on pages 4 and 5, Dr. Fall comments that the injections were not medically indicated.  Luckily for Mr. Julch, his treating physician clearly, and correctly, disagreed with Dr. Fall's assessment.

- On page 2, Dr. Fall acknowledges that the 3/26/14 MRI revealed left central and subarticular disc protrusion, mild impingement of the left L5 nerve root with subarticular narrowing, and a mild bulge at L5-S1; the 6/6/16 MRI was similar, but also disclosed a mild-to-moderate disk bulge at L4-5.  Nonetheless, on page 3, Dr. Fall baselessly opines that the MRIs "were not medically reasonable, necessary, and related to the motor vehicle collision."  It simply makes no sense that the MRIs, one of which was performed days after the accident and both of which reflected spinal injuries related to the accident, were not medically reasonable.  And, on page 9, Dr. Fall somehow concludes Mr. Julch did not suffer any back injuries, notwithstanding the MRIs.

- On page 2, Dr. Fall also notes the paucity of records pre-dating the accident; as has been explained repeatedly, Mr. Julch rarely sought any medical care whatsoever prior to the accident, and never missed a day of work from back or knee pain prior to the accident.

- On page 3, Dr. Fall comments, virtually out of thin air, "Anxiety has likely played a role in his persistent symptomatology despite the minimal mechanism of the injury."  Dr. Fall spent less than an hour with Mr. Julch, is not a psychologist, and is not otherwise qualified to opine on Mr. Julch's mental state.  The leap from the passing comment that he is sometimes nervous to the conclusion that his very serious injuries—which have been objectively and subjectively verified by medical testing and specialists' examinations—are psychosomatic, is indefensibly careless on Dr. Fall's part.

- Consistent with her apparent goal of finding every medical procedure undergone by Mr. Julch to be "not medically necessary," Dr. Fall states the referral for an orthopedic assessment was not indicated by the 3/28/14 MRI.  Mr. Julch's right

knee was injured in the accident. As of a week post-accident, and even as of today, that knee causes Mr. Julch pain and restricts his activities. An orthopedist is certainly the most qualified doctor to assess such a problem and recommend a course of treatment, regardless of what a particular MRI did or did not reveal. (In fact, even Dr. Fall herself admits on page 9 that Mr. Julch injured his knee in the accident).

- Dr. Fall, again with no attempt to provide any basis for her opinion, states on page 4 that there was no medical reason for Mr. Julch's lifting capacity to be restricted. Dr. Fall's opinion runs afoul of those of Dr. Sonstein and Dr. Brunworth. Dr. Sonstein imposed a 20-pound restriction. Independent medical examiner Dr. Brunworth suggested Mr. Julch not lift over 30 pounds. Dr. Fall's apparent position that a man with chronic back pain and bulging discs should not avoid straining his back is nonsensical.

- Dr. Fall's opinion on page 4 that Mr. Julch should not have been given an impairment rating because he was temporarily without pain—**after facet and epidural steroid injections and while following his treating doctor's suggested restrictions**—is baffling. Obviously, a person can be pain free, yet simultaneously impaired, if that freedom is the result of intrusive treatments and a restricted lifestyle.

- Lastly, Dr. Fall's comments about the mechanism of the accident are inconsistent with common sense. Remarkably, on page 9 of her report, Dr. Fall states that the fact that Mr. Julch's "seat did not break" proves he suffered no spinal injury whatsoever. Countless people suffer spinal injuries every day in automobile accidents, and that only in the rarest of instances does a seat "break."

41.     After receiving Dr. Fall's so-called report, Allstate again refused to pay Mr. Julch his UM/IUM benefits.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

42.     By this reference, Mr. Julch incorporates all foregoing allegations.

43.     Mr. Julch entered into an insuring agreement with Allstate.

44.     Allstate breached that agreement by failing to pay UIM benefits as promised.

45.     As a result of Allstate's breach of contract, Mr. Julch has suffered damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Contract)

46.     By this reference, Mr. Julch incorporates all foregoing allegations.

47.     It is the policy of this state, announced in C.R.S. § 10-1-101, that all persons providing insurance services to the public must "be at all times actuated by good faith in everything pertaining thereto." This duty is a broad and wide ranging one, extending to everything pertaining to the provision of insurance services to the public.

48.     Allstate breached its duty of good faith by, among other things, failing to timely process Mr. Julch's claims, denying Mr. Julch's claims without a reasonable basis for doing so, and by giving weight to a medical report from a doctor with the preconceived conclusion (to Allstate's benefit) that Mr. Julch did not sustain any compensable injuries in the March 21, 2014 accident, and which is contracted by Mr. Julch's treating physician and by the physician hired by the liability carrier to examine Mr. Julch.

49.     Allstate acted unreasonably under the circumstances, and knowingly or recklessly disregarded the validity of Mr. Julch's claims.

50.     As a result of Allstate's bad faith, Mr. Julch suffered damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Statute Unreasonable Delay and Denial)

51.     By this reference, Mr. Julch incorporates all foregoing allegations.

52.     Allstate unreasonably delayed and denied Mr. Julch's claims for payment of benefits.

53.     Pursuant to C.R.S. § 10-3-1116(1), Mr. Julch is entitled to reasonable attorney fees and two times the covered benefit.

WHEREFORE, Mr. Julch respectfully requests entry of judgment in his favor and against the Defendant; an award of damages sufficient to compensate Mr. Julch for his injuries and damages; all damages allowed pursuant to Mr. Julch's statutory claim; an award of pre- and post-judgment interest and costs of suit; and such other and further relief as the Court deems just.

### PLAINTIFF DEMANDS TRIAL TO A JURY.

DATED this 21st day of March, 2017.

EVANS & MCFARLAND, LLC

*The original signature is on file at Evans & McFarland, LLC*

By:  /s/ M. Gabriel McFarland
      M. Gabriel McFarland

ATTORNEYS FOR PLAINTIFF

**Plaintiff's Address:**
1509 S. Florence Way
Denver, CO  80247-8122

00066564.DOC;1